# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

          vs.                                  No. 1:22-CR-1324-WJ

**DARIO VEALE**,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT DARIO VEALE'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant Dario Veale's Motion to Suppress Evidence Derived from Post-Arrest Search (**Doc. 83**). In his motion, Defendant asks the Court to suppress evidence discovered by DEA agents when they searched his bags without a warrant at the DEA Albuquerque District Office. After considering the parties motions, responses, factual stipulations, and applicable law, the Court finds that Defendant's motion (**Doc. 83**) is not well-taken and is therefore **DENIED**.

## BACKGROUND[1]

In October of 2021, Albuquerque District Office ("ADO") DEA agents learned of a suspected source of supply of illegal narcotics. **Doc. 108 at 1**. Agents subsequently identified the source as Defendant Dario Veale. *Id.* Prior to Defendant's arrest in this case, A DEA agent acting

---

[1]On May 9, 2024, the parties filed stipulations regarding facts for Defendant's suppression motion. **Doc. 108**. The parties agreed that the Court may rely on the stipulated facts in making its determination as to whether evidence should be suppressed. *Id.* **at 1**. The facts in the background are taken from these stipulations as well as the parties' motions, responses, and exhibits.

undercover (the "UC") arranged two controlled buys with Defendant. *Id.* **at 2**. These controlled buys occurred on March 18 and March 24 of 2022. *Id.*

On March 18, 2022, the UC contacted Defendant via Facebook messenger. Defendant agreed to meet the UC and sell him 1,000 pills for $2,500. *Id.* Once at the agreed upon meeting spot, Defendant gave the UC a clear plastic bag containing blue pills marked "M-30" in exchange for the agreed upon $2,500. *Id.* These pills were later tested and confirmed to be 108.1 grams of a mixture and substance of fentanyl. *Id.*

On March 24, 2022, the UC again bought 1,000 pills from Defendant for $2,500. *Id.* After, Defendant and the UC exchanged the pills and money, the UC asked Defendant if he sold methamphetamine. *Id.* Defendant stated that he sold "Black" (Heroin), "Snow" (Cocaine), and "Wax" (marijuana concentrate). *Id.* On this same day, the UC also bought 25 grams of heroin from Defendant for $1,000.  *Id.* **at 3**. The pills and the suspected heroin were later tested at a DEA laboratory. *Id.* The pills were confirmed to be 108.2 grams of a mixture and substance containing fentanyl. The suspected heroin was confirmed to be 24.87 grams of heroin. *Id.*

Agents continued to monitor Defendant after these controlled purchases. *Id.* On April 13, 2022, agents obtained a federal search warrant for Defendant's residence at 534 Charleston St. SE, Apt A. *Id.*

A few days later, on April 17, 2022, agents received information that Defendant would be traveling on an Eastbound Greyhound bus arriving in Albuquerque, New Mexico the following day at 7:00 am. *Id.* On the morning of April 18, 2022, agents set up surveillance at the train station where Defendant's bus would arrive. Around 7:10 a.m. *Id.* **at 4.** Agents observed a grey Chevy Impala arrive at the station and park in the front. **Doc. 87-1 at 2**. Britania McNab, who agents knew as Defendant's girlfriend, was the driver of the Chevy Impala. *Id.* About ten minutes later, a Greyhound bus pulled into the station. *Id.* Agents observed Defendant exit the bus and begin to

walk towards the grey Chevy Impala. **Doc. 108 at 4.** Defendant was carrying multiple bags in his hands and had a Gucci handbag strapped over his shoulder. *Id.* Before Defendant reached the Chevy Impala, Agents arrested Defendant based on the two previous illegal drug sales on March 18 and March 24. *Id.* After arresting Defendant, agents conducted a pat-down and found a fully loaded Glock 30, .45 caliber semi-automatic handgun (serial no. BSRS375) tucked inside his jean jacket. *Id.* At this point, agents decided to transport Defendant to the DEA Albuquerque District Office ("ADO") because a crowd was beginning to form around the agents and Defendant. **Doc. 87-1 at 2**. Agents transported Defendant, the firearm, and all of Defendant's property back to the ADO. *Id.* Agents also arrested, detained, and transported Britania McNab to the ADO. *Id.*

Once at the ADO, agents performed an inventory of Defendant's bags. **Doc. 108 at 4**. The relevant DEA inventorying policy provides:

> A complete inventory shall be made of all property that is taken into custody by DEA for safekeeping, regardless of whether probable cause exists to search the property. Inventory searches are made to identify items of value in order to protect DEA personnel from claims of theft or loss of property that enters DEA Custody. Inventory searches need not be made contemporaneous with the arrest of any person or at the time of seizure but must be made as soon as practical after the property to be searched has been transported to a DEA or other law enforcement facility. Inventory searches shall be made of all containers, whether locked or unlocked, that are lawfully seized for safekeeping. All items shall be inventoried on a DEA-12, Receipt for Cash or Other Items, and the details of the inventory shall be reported in the DEA-6 that reports the related enforcement agency.

During this inventory search, agents discovered a vacuumed sealed bag with small blue pills inside Defendant's Gucci handbag. *Id.* These pills were later tested at the DEA Laboratory and confirmed to be 2,347 grams of a mixture and substance containing fentanyl. *Id.* **4–5**. Defendant also had $4,145 in in his wallet, a gray iPhone in a black otter box case, and a silver iPad in a red case. *Id.* **at 5.** Agents seized these items as evidence, including the Gucci handbag, and listed them on a DEA-6 form. *Id.* Also in Defendant's bags were clothing items, a charger, a yellow tablet, a doll, bodywash, and a toothbrush. *Id.* **at 6**. While agents photographed these items, they did not

complete a DEA 12 form or include these items on any inventory list. *Id.* Agents then transported Defendant to the U.S. Marshals Service for booking and transportation to Cibola County Correctional Center. *Id.* **at 5.** When an arrestee arrives at the U.S. Marshals Service for booking, their person and any property is searched and all items inventoried on a USMS-18 form. *Id.* **at 6.**

On the same day agents arrested Defendant, agents executed the federal search warrant approved on April 13, 2024, for his residence. *Id.* Agents documented the items seized from Defendant's person, in his handbag, and in his residence, in DEA-6 and DEA-7 reports. *Id.* All items were documented in photographs. *Id.* **at 6.**

As a result of these events, Defendant is charged in a superseding indictment with 11 counts:

1. 21 U.S.C. §§ 841(a)(1) and (b)(1)(A): Possession with Intent to Distribute 400 Grams and More of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide);

2. 18 U.S.C. § 924(c)(1)(A)(i): Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, and Possessing a Firearm in Furtherance of Such Crime;

3. 18 U.S.C. §§ 922(g)(1) and 924: Felon in Possession of a Firearm and Ammunition;

4. 21 U.S.C. §§ 841(a)(1) and (b)(1)(B): Distribution of 40 Grams and More of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide);

5. 21 U.S.C. §§ 841(a)(1) and (b)(1)(B): Distribution of 40 Grams and More of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide);

6. 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): Distribution of Heroin;

7. 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): Possession with Intent to Distribute Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide);

8. 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): Possession with Intent to Distribute Heroin;

9. 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): Possession with Intent to Distribute Cocaine;

10. 21 U.S.C. §§ 841(a)(1) and (b)(1)(C): Possession with Intent to Distribute Cocaine Base;

11. 18 U.S.C. §§ 922(g)(1) and 924: Felon in Possession of a Firearm and Ammunition.

**Doc. 69**.

## FOURTH AMENDMENT LAW

The Fourth Amendment provides in relevant part: "The right of the people to be secure . . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. "The ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Courts determine the reasonableness of a search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118–119 (2001)). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The United States bears the burden of proof to justify warrantless searches and seizures. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).

## DISCUSSION

In the instant motion, Defendant asks the Court to suppress any evidence obtained by DEA agents when they searched his bags without a warrant at the ADO. The United States asks the Court to deny the motion to suppress for two reasons. **Doc. 87 at 9, 12**. *First*, the United States argues that the evidence should not be suppressed because agents' warrantless search of Defendant's bags constituted a lawful inventory search. *Id.* **at 9**. *Second*, the United States argues that the evidence should not be suppressed because even if agents' inventory search was unlawful,

the evidence would have inevitably been discovered in a proper inventory search. *Id.* **at 12.**[2] The Court addresses each of these arguments below.[3]

## I.    DEA agents lawfully impounded Defendant's bags.[4]

The Court begins its analysis with DEA agents' impoundment of Defendant's bags at the train station.[5] This is because officers only have an obligation to safeguard the contents of an item, like a backpack, once it has been impounded. *See United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992) (finding that "no inventory of the contents of defendant's vehicle could have been conducted but for the unlawful impoundment of the vehicle"). Thus, courts must first determine if officers lawfully impounded the defendant's property before deciding whether the inventory search of that property was reasonable.

The Tenth Circuit has a well-established legal framework on police-ordered impoundments of vehicles arising from *United States v. Sanders*, 796 F.3d 1241 (10th Cir. 2015). Here, however, agents impounded Defendant's bags not his vehicle. Still, the "principles from these vehicle-impoundment cases are relevant in the context of personal property." *United States v. Braxton*, 61 F.4th 830, 834 (10th Cir. 2023); *see also United States v. Knapp*, 917 F.3d 1161 (10th Cir. 2019) (noting that principles articulated in vehicle-impoundment caselaw "apply more broadly" and

---

[2]The United States also argued that the evidence from the inventory search would have inevitably been discovered pursuant to a search warrant. **Doc. 87 at 12**. The Court does not address this argument as the evidence would have inevitably been obtained through a proper inventory search.

[3]Defendant does not argue that his arrest was unlawful, therefore the only issues before the Court are the lawfulness of agents' impoundment of Defendant's bags and the reasonableness of agents' inventory search of Defendant's as well as whether the evidence from the inventory search would have inevitably been discovered through lawful means.

[4]Defendant agrees that agents could seize his bags at the station. **Doc. 105 at 2.** Nonetheless**,** the Court examines the impoundment because the lawfulness of the impoundment is a critical first step in assessing the reasonableness of an inventory search and determining the applicability of inevitable discovery doctrine.

[5]The location where this occurred is not simply a Greyhound bus station. 100 1st Street SW is a transit hub for ABQ Ride, Amtrak, Southwest Chief, Rail Runner Express, Rapid Ride, and Greyhound. *See* Visit Albuquerque, *Alvarado Transportation Center* (last visited May 14, 2024), https://www.visitalbuquerque.org/listing/alvarado-transportation-center/3558/ [https://perma.cc/RWA6-5BJQ].

6

using such caselaw to review search of defendant's purse). Therefore, the Court uses *Sanders* and its progeny to guide its analysis of the police-ordered impoundment in this case.

In *Sanders*, the Tenth Circuit fashioned a two-part inquiry for assessing the constitutionality of a police-ordered impoundment of a vehicle "not impeding traffic or impairing public safety": (1) whether impoundment is guided by "standardized policy," and (2) whether impoundment is justified by a "reasonable non-pretextual community-caretaking rationale." 796 F.3d at 1248.

In a later case, *United States v. Kendall*, the Tenth Circuit clarified that the first *Sanders* inquiry only applies to police-ordered impoundments on private property. 14 F.4th 1116, 1122 (10th Cir. 2021) (citing *United States v. Venezia*, 995 F.3d 1170, 1178 (10th Cir. 2021)). Here, DEA Agents impounded Defendant's bags on public property. Accordingly, the first *Sanders* inquiry – whether the impoundment is guided by standardized criteria – is not applicable.

While the first *Sanders* inquiry is not applicable in this case, the second is. *See Kendall*, 14 F.4th at 1123 (explaining that the second *Sanders* inquiry "applies to all community-caretaking impoundments. . . whether on private or public property"). The *Sanders* court set forth a non-exclusive list of factors relevant in determining whether a reasonable, non-pretextual community-caretaking rationale justifies an impoundment:

  (1) whether the vehicle is on public or private property

  (2) if on private property, whether the property owner has been consulted;

  (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle);

  (4) whether the vehicle is implicated in a crime; and

  (5) whether the vehicle's owner and/or driver have consented to the impoundment.

796 F.3d at 1250. These factors are often referred to as the *Sanders* factors.

Before discussing the current case, it is helpful to review a recent decision from the Tenth Circuit that addressed a similar impoundment to the one before this Court. In *Braxton*, the Tenth Circuit considered the reasonableness of officers' impoundment of a backpack. 61 F.4th 830 (10th Cir. 2023). The *Braxton* court applied the five *Sanders* factors to determine if officers lawfully impounded the defendant's backpack. *Id.* at 835. The specific *Sanders* factor at issue was the third one – whether there was an alternative to impoundment. *Id.*

During the defendant's arrest, he called out, "Hey, get my girl, my girl. Tan! Tell her to come here!" *Id.* at 832. A woman promptly approached and asked to "get his bag" and then asked to, "take my backpack." *Id.* The defendant also stated, "[s]he needs the money, man." Officers refused to allow the woman to take the backpack. *Id.* Although the defendant did not explicitly instruct the officers to give his backpack to the woman, the *Braxton* court found that an alternative to impoundment existed because the woman was physically present at the scene, clearly knew the Defendant, and repeatedly requested to take the backpack. *Id.* 836–37. Based on this finding, the court determined that this factor weighed heavily against the reasonableness of the impoundment. *Id.* at 837. The court ultimately held that the impoundment of the backpack was unreasonable because the fourth, and fifth *Sanders* factors also weighed against the reasonableness of impoundment. *Id.* at 838–39.

Turning to the current case, the first *Sanders* factor weighs in favor of the reasonableness of impoundment because agents arrested Defendant on public property at the train station[6], and the second factor is not relevant. *Id.* (explaining that the first *Sanders* factor weighs in favor of reasonableness and the second factor is not relevant because the arrest took place on public property).

---

[6] Defendant does not dispute that the train station is public property.

With respect to the third *Sanders* factor, this factor also weighs in favor of the reasonableness of the impoundment as DEA agents had no reasonable alternatives to impoundment. *First*, although Defendant's girlfriend, Britania McNab, was present at the scene, giving Defendant's bags to her was not a reasonable alternative. As highlighted by the United States, Ms. McNab was also arrested for involvement in prior drug offenses at the train station. Consequently, unlike the scenario in *Braxton* where a willing individual could have taken the bag and left, here, neither the Defendant nor Ms. McNab could do so as both were arrested by agents and transported to the ADO.

*Second*, leaving the bags unattended at the train station was not a reasonable alternative due to the risk of theft or damage. Moreover, leaving a bag in a public location without knowledge of its contents raises serious safety concerns. What if the bag contained a loaded firearm or, as in this case, a significant quantity of drugs? Were agents expected to disregard these risks and abandon the bag at the station simply because it was an alternative to impoundment? The answer to this question is a firm no – an impractical and dangerous alternative to impoundment is no alternative at all. Agents only option then was to impound and transport Defendant's bags to the ADO.

To summarize, the first and third *Sanders* factors support (or weigh in favor of) the reasonableness of the impoundment, and the second *Sanders* factor is irrelevant. Additionally, Defendant did not consent to the impoundment, so the fifth factor weighs against the reasonableness of the impoundment. This leaves only the fourth factor to consider – whether the backpack was implicated in a crime. However, determining whether this factor weighs against or in favor of the reasonableness of the impoundment is unnecessary. Even if it were to weigh against reasonableness, the combined weight of the factors would still slightly favor the impoundment's reasonableness, given the greater weight afforded to the third *Sanders* factor. *See Venezia*, 995

F.3d at 1182 (concluding that existence of alternative rendered impoundment unreasonable); *Kendall*, 14 F.4th at 1123 (concluding that the "balance clearly weighs in favor of the reasonableness of impoundment, partly because there were no good alternatives"). Considering that the *Sanders* factors support the reasonableness of the impoundment, the Court concludes that the agents' impoundment of Defendant's bags was justified by a reasonable non-pretextual community-caretaking rationale, making it a lawful impoundment.

## II.   Agents' inventory search of Defendant's bags at the ADO was reasonable.

Now that it is established that agents' impoundment of Defendant's bags was lawful, the Court proceeds to evaluate the reasonableness of agents' inventory search. Inventory searches are "a well-defined exception to the warrant requirement." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items . . . and to protect against false claims of loss or damage." *Wren v. United States*, 517 U.S. 806, 812 n.1 (1996) (citing *South Dakota v. Opperman*, 428 U.S. 364 (1976)). Inventory searches commonly occur in cases involving vehicle impoundments, but they also occur when officers impound personal property, like backpacks or handbags, from an arrestee. The United States Supreme Court examined the latter scenario in *Illinois v. Lafayette* and held that it is consistent with the Fourth Amendment and entirely proper for "police, at the station house, to remove and inventory property found on or in the possession of an arrested person who is to be jailed." 462 U.S. 640, 646–47 (1983).

While inventory searches do not require probable cause or a warrant, they are limited in other ways. *First*, inventory searches are only reasonable if conducted according to standardized procedures. *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). Under this first prong, "there is no reason to insist that they be conducted in a totally mechanical all or nothing fashion." *Florida v. Wells*, 495 U.S. 1, 4 (1990). *Second*, "the policy or practice governing

inventory searches should be designed to produce an inventory." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (citing *Wells*, 495 U.S. at 4). In considering these factors, courts determine whether an inventory search was used as "a ruse for a general rummaging in order to discover incriminating evidence." *Id.*

Here, Defendant concedes that the relevant DEA policy is designed to produce an inventory; however, he argues that agents failed to conduct the inventory search of his bags according to standardized procedure because "no DEA-12 form was created and the DEA-6 form only lists *evidence* taken from the bags." **Doc. 83 at 5** (emphasis in original). Defendant further argues that "this failure to list non-evidence items demonstrates that the search was really a general rummaging for evidence." ***Id.***

The United States counters that agents properly documented all items seized as evidence from Defendant's handbag on a DEA-6 form and that a DEA-12 form was not required. ***Id.*** According to the United States, the DEA-12 form is used to record valuable items seized by the DEA for safekeeping, and since only the items seized as evidence by agents were considered valuable, no DEA-12 form was required. ***Id.* at 12**.

Given that the language of the policy provides that "[**a**]**ll** items shall be inventoried on a DEA-12," the Court agrees with Defendant that the inventory policy required agents to create a DEA-12 form listing even those items not considered items of value. However, the Court disagrees with Defendant that agents' failure to create a DEA-12 form listing all Defendant's property, renders the search unreasonable. This is because strict compliance with inventorying policy is not required to establish the reasonableness of an inventory search.

Indeed, federal courts consistently uphold inventory searches despite officers failing to create a complete inventory list as required by standardized inventorying policy. *See United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) (affirming district court's conclusion that officers

conducted a lawful inventory search despite their failure to complete an inventory list that would ordinarily be completed as part of a department inventory search); *United States v. Cartwright*, 630 F.3d 610, 616 (7th Cir. 2010) (upholding inventory search despite the incomplete inventory list); *United States v. Lopez*, 547 F.3d 364, 370 (2d Cir. 2008) (rejecting the proposition that "the search. . . failed to meet the [constitutional] requirement that the objective of the search must be to produce an inventory [,] [b]ecause the search . . . did not result in a complete list of the contents of the car"); *United States v. Richardson*, 2000 WL 1273425, at *2 (4th Cir. Sept. 5, 2000) (per curiam) (unpublished) ("[T]he failure to complete an inventory list does not render suspect either the motive for conducting the search or the reasonableness thereof.");*United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) (per curiam) ("failure to compile the written inventory does not render the inventory search invalid"); "); *United States v. Ulibarri*, No. CR 21-1826 JB, 2024 WL 1113861, at *51 (D.N.M. Mar. 14, 2024) (concluding that officers inventory search was valid despite officers failure to create a written inventory list). Most notably, the Supreme Court in *Bertine* upheld an inventory search where officers failed to inventory credit cards, approximately $910 in cash, and other valuable items despite standardized inventorying policy requiring a detailed inventory list. 479 U.S. at 383 (Marshall, J., dissenting).

In line with these cases, the Eight Circuit has explained that failure to follow standard procedures, like creating a comprehensive inventory, does not alone render a search unreasonable. *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020) (internal citation omitted). "[T]here must be something else; something to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Id.*

Therefore, in this case, agents' failure to strictly comply with policy or produce a complete inventory does not render the search unreasonable or indicate that it was a ruse for general

rummaging. This is especially true given that the agents largely complied with standardized policy and the search achieved all the goals of an administrative inventory search.

According to the DEA policy agents are required to conduct inventory searches on all property taken into custody for safekeeping. Agents complied with this requirement by conducting an inventory search on all of the Defendant's property in DEA custody. The inventory policy also mandates that the search should occur as soon as practical after the property is brought to a DEA or other law enforcement facility. Agents again complied with this requirement by conducting an inventory search of the Defendant's bags immediately upon their arrival at the DEA facility. Additionally, agents completed a DEA-6 form as required by DEA policy. Finally, although agents did not create a DEA-12 form with a complete inventory of all items, they effectively fulfilled this requirement by taking photographs of the Defendant's bags and the items within. Certainly, such a search ensured that Defendant's property was harmless to officers, secured valuable items, and protected against false claims of loss or damage despite not strictly complying with standard policy. For these reasons, the Court finds that officers' inventory search was reasonable and not a ruse for general rummaging.

However, even assuming that agents' failure to complete a DEA-12 with a complete inventory rendered the search unreasonable, suppression is still not warranted in this case.

**III.   Suppression of the evidence officers obtained from the inventory search is not warranted under the inevitable-discovery doctrine.**

"If law enforcement searches or seizes without a warrant or applicable warrant exception and thus obtains evidence through an unconstitutional search, the evidence is inadmissible under the exclusionary rule." *Braxton*, 61 F.4th at 833 (quoting *United States v. Neugin*, 958 F.3d 924, 931 (10th Cir. 2020). However, similar to the warrant requirement, the exclusionary rule is subject to exceptions. *Id.* One such exception is the inevitable-discovery doctrine. *Id.* Under this doctrine, "illegally obtained evidence may be admitted if it ultimately or inevitably would have been

discovered by lawful means." *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). To prove that the evidence would have been discovered by lawful means, the United States can rely on a hypothetical inventory search. *Tueller*, 349 F.3d at 1241 (applying inevitably discovery-doctrine because hypothetical inevitable inventory search would have been constitutional and uncovered evidence at issue).

In cases where officers lawfully impound a defendant's property but subsequently conduct an improper inventory search, the inevitable-discovery doctrine applies if the United States establishes that (1) an inventory search was required following the impoundment and (2) officers still would have discovered the evidence had the inventory search been conducted properly.

For example, in *Haro-Salcedo,* the Tenth Circuit concluded that officers' inventory search of a defendant's vehicle that revealed cocaine in the vehicle's truck was an improper inventory search conducted for investigatory not administrative purposes. 107 F.3d at 772. Nonetheless, the Court concluded that suppression of the cocaine was not appropriate under the inevitable-discovery doctrine. *Id.* at 773. In reaching this decision, the Court highlighted that officers lawfully impounded the defendant's vehicle, standard police policy mandated an inventory search of the impounded vehicle, and the parties all agreed that a proper inventory search would have revealed the cocaine. *Id.* The *Haro-Salcedo* court also likened the facts before it to the facts in *United States v. Horn*, 970 F.2d 728 (10th Cir. 1992) to reach its conclusion. 107 F.3d at 773.

In *Horn*, the Tenth Circuit similarly addressed an unlawful inventory search of a vehicle preceded by a lawful impoundment. 970 F.2d at 732. The *Horn* court applied the inevitable discovery doctrine, reasoning that even if the actual inventory search conducted by officers was unlawful, the search still would have uncovered the evidence had the inventory search been conducted as the defendant suggested was proper:

> [e]ven assuming arguendo that the search beside the highway was improper and
> should have been conducted in a different manner, had the search been conducted

in the manner Defendant suggests is proper, it was inevitable that the weapons would have been discovered and that defendant would have been charged with their possession.

*Id.*

Similarly, here, agents lawfully impounded Defendant's bags, DEA policy required agents to conduct an inventory search following the impoundment of Defendant's bags, and agents still would have discovered the evidence at issue had the search been conducted as Defendant suggests is proper; the only difference would be a more complete inventory list and a DEA-12 form.[7] Consequently, the evidence at issue would have inevitably been discovered through a proper inventory search following the impoundment of Defendant's bags.

Additionally, the United States argues that even if no inventory search pursuant to the impoundment was conducted, the evidence at issue would have been discovered through a proper inventory search at booking. **Doc. 87 at 12**. The Court agrees. If Defendant's bags had not been searched and seized at the ADO, they would have been transported with him to the U.S. Marshals Service, where the marshals would have been required to search them, leading to the discovery of the evidence at issue.

Defendant argues that the United States failed to establish that discovery of the evidence at booking was inevitable because the U.S. Marshals did not conduct a search at booking. **Doc. 105 at 3**. The Court disagrees. As previously mentioned, the United States can rely on a hypothetical inventory search to establish that evidence would have inevitably been discovered. Further, the Marshals could not have searched Defendant's Gucci handbag at booking because DEA searched and seized the bag at the ADO. However, had there been no inventory search and seizure at the ADO, the U.S. Marshals would have inventoried Defendant's handbag and discovered the evidence at issue.

---

[7] In his reply, Defendant concedes that whether an inventory search could legitimately be conducted is not disputed. **Doc. 105 at 2**.

In sum, the evidence at issue, including the fentanyl pills, would have either been discovered through proper inventory search pursuant the impoundment of Defendant's bags or through a proper inventory search at booking.

## **CONCLUSION**

In brief, suppression of the evidence obtained from DEA agents' warrantless search of Defendant's bags at the ADO is not warranted because (1) the search was a lawful inventory search and (2) even if the search was not a lawful inventory search, the evidence obtained from the search would have inevitably been discovered pursuant to a proper inventory search. Consequently, the Court **DENIES** Defendant's Motion to Suppress (**Doc. 83**).


**IT IS SO ORDERED.**


_____/s/_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE